United States District Court
Southern District of Texas
**ENTERED**
September 04, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SOPHY  TREADWAY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:19-CV-244 |
| | § | |
| SOPHEAK  OTERO, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

On August 23, 2019, Plaintiff Sophy Treadway[1] brought this civil action against

Defendants Sopheak and Matthew Otero ("the Oteros" or "the Otero Defendants"), and

Exxizz Foods, Inc., d/b/a Rockport Donuts ("Exxizz").   Plaintiff filed an amended

complaint alleging four counts of human trafficking against the Defendants.  (D.E. 48).

Generally, she alleges she was brought to the United States from Cambodia and forced to

perform labor for inadequate compensation.[2]   Plaintiff brings her claims pursuant the

Trafficking Victims Protection Act ("TVPA") under sections 18 U.S.C. §§ 1581, 1589,

1590, 1593A and 1595.[3]

---

[1]Plaintiff Sophy Treadway was known as Sophy Yourn Keom prior to her marriage.  (D.E 121-1, Page 2).  The undersigned refers to her only as Plaintiff Treadway throughout this Memorandum and Recommendation to avoid any confusion.

[2]Plaintiff has also joined an action against Defendant Exxizz Foods under the Fair Labor Standards Act ("FLSA").  Case No. 2:19-cv-132.  Plaintiff voluntarily dismissed her previous FLSA action against Defendant Exxizz Foods shortly prior to the scheduled trial date, after joining the case above.  Case No. 18-cv-259.

[3]Plaintiff again asserts a claim under 18 U.S.C. §1593A.  (D.E. 1).  However, any reference to this section was struck in Plaintiff's original complaint and therefore, may be stricken again prior to any trial in this case for the same reasons.  (D.E. 28 and D.E. 42).  The undersigned makes no recommendation on this claim.

Pending are the parties' Motions for Summary Judgment, responses and replies. (D.E. 118; D.E. 119; D.E. 121; D.E. 122; D.E. 134; D.E. 137; D.E. 138, D.E. 140 and D.E. 141).  The undersigned **RECOMMENDS** both Motions for Summary Judgment be **DENIED**.  (D.E. 118 and D.E. 121).  Also pending is Plaintiff's Motion to Strike, Defendants' response and Plaintiff's reply.  (D.E. 129; D.E. 142; and D.E. 144).  The undersigned recommends this Motion be **DENIED**.  (D.E. 129).

## I.    BACKGROUND

Sopheak Otero immigrated from Cambodia to the United States as a young girl. (D.E. 121-1, Page 2 and D.E. 122-2, Page 3).  She traveled to Cambodia several times during 2003-2008 until she and her family, including her husband Matthew Otero, moved to Cambodia in 2009.  (D.E. 121-1, Page 2 and D.E. 121-2, Page 3).  At that time, she employed two family members to work as domestic help:  Plaintiff Treadway and Sineoun Mao, paying them each $150.00 per month plus room and board.  (D.E. 121-1, Pages 2-3 and D.E. 121-2, Page 3).  At the end of 2011, the Oteros moved back to Long Beach, California, assisting both Plaintiff Treadway and Ms. Mao with obtaining temporary six-month visas to be able to relocate with them.  (D.E. 119-2; D.E. 121-2, Pages 3-4; D.E. 121-3, Pages 9-10 and 12).  Both women were listed as domestic help in the visa documents.  (D.E. 119-1, Page 6; D.E. 119-7 and D.E. 119-8).  Shortly thereafter, the Oteros, Plaintiff Treadway and Ms. Mao relocated to Rockport, Texas, after the Oteros purchased a donut shop where both Plaintiff Treadway and Ms. Mao then worked along with the Oteros.  (D.E. 121-2, Page 4).

The Oteros allege, which Plaintiff denies, that they made efforts to extend the temporary visas but were unsuccessful. (D.E. 121-2, Page 4 and D.E. 121-3, Page 18). Eventually both women married United States citizens. Ms. Mao married in February 2014, relocating with her husband to Long Beach, California in January 2015. Plaintiff Treadway married Rocky Treadway in February 2015. (D.E. 119-4, Pages 5-6 and 14-18; D.E. 119-5, Pages 5-8; D.E. 121-1, Page 5; D.E. 121-4, Pages 14, 39-40; and D.E. 121-3, Page 10). Both prior to and after her marriage, Plaintiff Treadway worked at the donut shop in Rockport, Texas. (D.E. 121-1 and D.E. 121-3, Page 13, 17). In April 2016, Plaintiff Treadway received her permanent resident card and starting June 1, 2016, the Oteros allege she became a W-2 employee at the donut shop. (D.E. 121-2, Page 6; D.E. 121-3, Pages 18-19; D.E. 122, Page 110). Plaintiff Treadway worked at the donut shop until August 20, 2018, when the Oteros reviewed shop security footage which allegedly showed Plaintiff Treadway stealing money from the register. (D.E. 121-2, Pages 6-7; D.E. 121-4, Pages 65-67 and D.E. 121-9). The Oteros reported this alleged theft of approximately $67,000.00 to the Rockport Police and Plaintiff Treadway was arrested. (D.E. 121-1, Pages 4-5).[4] To date, there has been no resolution of those charges.

---

[4]Plaintiff has filed a Motion to Strike. (D.E. 129). Specifically, Plaintiff objects to admission of the immigration documents filed under seal by Defendants (D.E. 122) and to any reference of her alleged theft and subsequent arrest. The undersigned recommends this Motion be **DENIED**. The immigration documents are clearly relevant to this case and Plaintiff's counsel has full access to the sealed docket entry containing these documents and had prior access to these documents as they were produced by Plaintiff Treadway's husband. (D.E. 133). Further, while Plaintiff's counsel asserts he did not represent Plaintiff until 2018 and therefore defense counsel has filed misrepresentations in bad faith that his representation began in 2016, the evidence suggests, as indicated by defense counsel, that Plaintiff's counsel first represented Plaintiff as immigration counsel in early 2016, not 2018. (D.E. 122, Pages 94, 96, 106 and D.E. 121-4, Pages 29-31). Prior to that, Plaintiff Treadway was represented solely by the firm of Rodriguez & Moretzsohn for immigration matters. (D.E. 122, Page 91). As to Plaintiff's alleged theft, it is

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp*., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id*. Furthermore, affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56; *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider

---

relevant at this stage for a variety of reasons including, but not limited to, why Plaintiff allegedly left Exxizz's employ.  Additionally, while the Court does not evaluate the credibility of witnesses at the summary judgment stage, the issue of Plaintiff Treadway's credibility will clearly be raised by the defense during the trial in this matter.  (D.E. 142).  Therefore, it is likely the probative value of this evidence will substantially outweigh any danger of unfair prejudice as to credibility and the possible litigation motivation of all parties.  Lastly, the Court is capable of determining which arguments have merit and which are supposition.

hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 248. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

"Where there are cross-motions for summary judgment, the party bearing the burden of proof at trial must satisfy not only the initial burden of production on the summary judgment motion by showing that there is no genuine issue of material fact, but also the burden of persuasion on the claim itself by showing that it would be entitled to judgment as a matter of law at trial." *Martinez v. Refinery Terminal Fire Co.*, No. 2:11-cv-295, 2013 WL 6838864, at *2 (S.D. Tex. Dec. 27, 2013)(citing *Provenza v. Gulf South Admin. Serv., Inc.*, 67 F.Supp.2d 617, 619 (M.D. La. 1999)). "Each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Id.*(citing *Am. Int.'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 6662 (5th Cir. 2012). "If there is no genuine issue of fact and one party is entitled to prevail as a matter of law, the court may render summary judgment. *Id.*(citing *Shaw Constructors v. ICF Kaiser Eng'r, Inc.*, 395 F.3d 533, 539 (5th Cir. 2004)).

## III.    TRAFFICKING VICTIMS PROTECTION ACT ("TVPA")

The Trafficking Victims Protection Act, prohibits, in relevant part, holding a person in condition of peonage under 18 U.S.C. § 1581 ("Section 1581"), forced labor obtained by any of multiple possible means under 18 U.S.C. §§ 1589 ("Section 1589"), trafficking under 18 U.S.C. § 1590 ("Section 1590") and benefitting financially from a violation of the TVPA under 18 U.S.C. § 1593A ("Section 1593A").[5]  Civil liability is

---

[5]Section 1593A provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in any act in violation of this chapter, knowing or in reckless disregard

allowed against individuals who violate the TVPA pursuant to 18 U.S.C. § 1595 ("Section 1595").[6]

The TVPA was enacted as "an Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking." H.R. Conf. Rep. 106–939, at 1 (Oct. 2000). The main purpose of the TVPA was to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id.* at 3. While many trafficking victims are forced or coerced into the international sex trade, "trafficking also involves violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion." *Id.* at 4.

## IV. ANALYSIS

Plaintiff asserts four related claims under the TVPA: a claim of holding a person in condition of peonage under Section 1981, a claim of forced labor under Section 1589,

---

of the fact that the venture has engaged in such violation, *shall be fined under this title or imprisoned in the same manner as a completed violation of such section*. (emphasis added).

[6]Section § 1595(a) states:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

a claim for trafficking under Section 1590, and a claim for benefiting financially from a violation of the TVPA under Section 1593A.  Peonage under Section 1581 is a form of involuntary servitude.  "Peonage is a status or condition of compulsory service or involuntary servitude based upon a real or alleged indebtedness." *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1945)(citations omitted).  To state a claim for involuntary servitude, a plaintiff must prove she suffered physical or legal coercion or threatened use of physical or legal coercion.  *See United States v. Kozminski*, 487 U.S. 931, 944 (1988). Forced labor under Section 1589 encompasses labor procured by actions or threats which cause or could cause serious harm.  18 U.S.C. § 1589.  To establish a claim of forced labor under Section 1589, Plaintiff must show Defendants knowingly provided or obtained her labor or services by any one or combination of the following means:  "force, threats of force, physical restraint, or threats of physical restraint;" "serious harm or threats of serious harm;"[7] "the abuse or threatened abuse of law or legal process;"[8] or "any scheme, plan or pattern intended to cause [her] to believe that, if [she] did not perform such labor or services, that [she] or another person would suffer serious harm or physical restraint." *Id*.

---

[7]"Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor and services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

[8]"Abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

The parties submit two very different versions of their relationship with one another and the surrounding circumstances since their arrival in Rockport, Texas, based in large part on their own testimony and affidavits.[9]  The Otero Defendants testified they paid approximately $20,000.00 each to ultimately obtain visas and airplane tickets for Plaintiff Treadway and Ms. Mao to travel to the United States from Cambodia.  (D.E. 119-1, Pages 7 and 8; D.E. 119-2, Pages 4 and 5; D.E. 137-1, Page 4 and D.E. 137-2, Page 4).  They both also testified they never sought repayment for this money expended or required Plaintiff Treadway or Ms. Mao to work for them to repay them.  (D.E. 119-1, Page 8; D.E. 119-2, Page 5; D.E. 137-1, Pages 4-5 and 8-9; D.E. 137-2, Pages 4 and 8-9 and D.E. 138, Pages 4-5).  In contrast, Plaintiff Treadway testified she was told by the Otero Defendants that she had to work for them for three years to pay back the amount owed or they would send her back to Cambodia, with Matthew Otero taking her passport away on several occasions.  (D.E. 119-3, Pages 8-9 and 10-11-12 and D.E. 121-3, Pages

---

[9]In addition to Plaintiff's separate Motion to Strike as previously discussed, the parties make numerous objections to the other's evidence in their responses and replies.  (D.E. 137, Pages 22-40 and D.E. 141, Pages 2-3).  Having considered these objections, the undersigned recommends the Court sustain Defendants' objections (D.E. 137, Pages 22-29) and strike the report of attorney Peter Williamson.  (D.E. 119-6).  The undersigned recommends the report, submitted to defense counsel on or about July 10, 2020, well after the relevant deadlines, was untimely.  (D.E. 24).  Plaintiff's expert designation deadline was April 1, 2020 and while Plaintiff designated Mr. Williamson on February 7, 2020, there is no dispute that it was not accompanied by his written report as required by Federal Rule of Civil Procedure 26.  (D.E. 51).  Additionally, while Plaintiff argues the delay in taking Rocky Treadway's deposition delayed the preparation of Mr. Williamson's report, nothing prevented Mr. Williamson from preparing his report and later supplementing it as needed.  The delay clearly causes prejudice to the Defendants when reviewing the date the untimely report was submitted with the other relevant scheduling order deadlines. Additionally, the report is riddled with impermissible legal conclusions as outlined by Defendants.  (D.E. 137, Pages 25-26).  Lastly, Defendants correctly note Mr. Williamson has not been designated as, or shown to be, an expert as to damages and yet a large portion of his report contains his opinion as to wage calculations and overall damages.  (D.E. 119-6, Pages 14-18).  As to the remainder of the parties' objections, the undersigned recommends they be overruled.  The evidence in this case is based largely upon the testimony of the parties and their respective spouses and will clearly have the tendency to be self-serving all around.  The Oteros newly submitted declarations are no exception but Plaintiff has not shown they conflict with any prior testimony.  (D.E. 137-1 and D.E. 137-2).  Additionally, the undersigned finds the social media, photos and text evidence are sufficiently authenticated in the Defendants' affidavits and in the parties' deposition testimony.

15-17).  Ms. Mao also testified she initially had to work for the Oteros for two years, which was later changed to three years, to pay for the cost of bringing her to the United States, that Matthew Otero also took her passport away for a period of one week and he repeatedly threatened to have both herself and Plaintiff Treadway deported.  (D.E. 119-4, Pages 10-12, and 13-20).  Ms. Mao's husband, Thomas Barnes, further testified Matthew Otero told him Ms. Mao was under contract to work for him for two, and later, three years.  (D.E. 119-5, Pages 5 and 7).  He and Ms. Mao also testified it was for this reason Ms. Mao did not go with Mr. Barnes to California immediately after their February 2014 wedding, waiting until January 2015, almost 11 months, for Ms. Mao to go to California even though Matthew Otero continued to object, threatened to report her to immigration and accused her of theft.   (D.E. 119-4, Pages 15-18 and D.E. 119-5, Pages 7-8). Rockway Treadway testified he and Plaintiff were engaged in 2012 but they waited several years to get married until Plaintiff no longer owed the Oteros.  (D.E. 121-4, Pages 69-70).  The Otero Defendants deny they ever told Plaintiff Treadway or Ms. Mao they had to work for them for any set period and never threatened them with deportation. (D.E. 137-1, Pages 8-10 and D.E. 137-2, Pages 8-10).

While working for the Oteros, Ms. Mao testified she and Plaintiff Treadway worked seven days a week, 365 days a year for $75.00 to $100.00 in cash a month each. (D.E. 119-4, Pages 23 and 25).  Plaintiff Treadway further testified the Oteros provided her room and board as well as clothes and medical care and provided her with $500.00 in cash each month for the three to four months prior to her becoming a salaried employee

at the donut shop.  (D.E. 121-3, Pages 11 and 19-20).[10]  Ms. Mao testified she and Plaintiff Treadway would wake up at 1:00 a.m., start work at the donut shop at 1:30 a.m. and work there until 4:00 p.m. with short breaks until they would both then return to the Otero's home where they would clean the house, cook for and generally take care of the Otero's three children, all under the age of 10, before going to bed around 8:30 p.m., with Plaintiff Treadway sometimes working later.  (D.E. 119-4, Pages 6-8 and 21 and 23). Plaintiff testified similarly that she would wake up at 1:00 a.m. and work until 4:00 p.m. at the donut shop and then return to the Otero's home to work there as well.  (D.E. 119-3, Pages 7-8).

Defendants assert Plaintiff Treadway and Ms. Mao were treated as family members and everyone in the family "pitched in to help make our venture a success" as the donut shop was a "future for everyone," stating Plaintiff Treadway and Ms. Mao were to eventually to take over the business viewed as a family venture.  (D.E. 121-2, Pages 4-5; D.E. 121-3, Page 21; D.E. 137-1, Page 7 and D.E. 137-2, Page 7).[11]  The Oteros further averred they fed, clothed, housed and paid for medical care for Plaintiff Treadway and Ms. Mao in addition to giving them "several thousand dollars over the years."  (D.E. 121-2, Page 5; D.E. 137-1, Pages 7-9 and D.E. 137-2, Pages 7-9).  Defendants also assert

---

[10]Ms. Mao described their housing as a 20 by 18 foot one-car garage behind the Otero's Rockport home which she shared with Plaintiff Treadway as well as Sopheak Otero's grandmother, who she also assisted with taking care of. (D.E. 134-3, Page 2 and D.E. 134-5).  Ms. Mao testified she and Plaintiff Treadway had a double bed.  (D.E. 134-5). Defendants describe the provided housing as an air-conditioned, converted studio apartment with a bedroom, kitchenette, and bathroom with unlimited access to leave freely.  (D.E. 137-1, Page 6 and D.E. 137-2, Page 6).  They further state Plaintiff Treadway and Ms. Mao slept on a bunk bed and Sopheak Otero's grandmother slept on a pull-out bed in the living room, acknowledging Plaintiff Treadway and Ms. Mao helped care for her.  (D.E. 137-1, Page 7 and D.E. 137-2, Page 7).  Mr. Treadway testified he visited Plaintiff there and did not recall seeing a kitchen. (D.E. 121-4, Page 15).

[11]Plaintiff confirmed Sopheak Otero did discuss her taking over the donut shop in the future.  (D.E. 121-3, Page 18).

they never forced either Plaintiff Treadway or Ms. Mao to work long hours in the donut shop or at home and neither worked 14-15 hours per day. (D.E. 137-1, Page 7 and D.E. 137-2, Page 7). Defendants also assert Plaintiff Treadway and Ms. Mao both went on many dates alone with their now husbands and they both took trips them with prior to their marriages. (D.E. 121-2, Page 5; D.E. 121-3, Page 11 and D.E. 121-4, Pages 14-15). Additionally, Defendants aver Plaintiff and Rocky Treadway would spend the holidays with their family, including Christmas, Thanksgiving, Halloween and visits to the Buddhist Temple, submitting photos in support. (D.E. 121-2, Page 5; D.E. 121-4, Pages 42-49; D.E. 121-5; D.E. 121-6 and D.E. 137-3). Defendants also assert Plaintiff had her own cell phone purchased for her by Rocky Treadway and a tablet and she would use them to speak with her family members in Cambodia. (D.E. 121-3, Page 13 and D.E. 121-4, Pages 18-20). Defendants also argue Plaintiff had at least one social media account she regularly used. (D.E. 121-4, Pages 19-20 and 26; D.E. 121-7 and D.E. 137-5). Rocky Treadway testified Plaintiff did have a cell phone, tablet and a social media account. (D.E. 121-4, Pages 18-20). Further, after she received her green card, Defendants assert Plaintiff could have worked anywhere but chose to work at the donut shop, which is supported by Plaintiff's testimony. (D.E. 121-3, Pages 18-19). Additionally, Plaintiff and her husband took a 40-day trip to Cambodia after they were married and she had received her green card, which Rocky Treadway confirmed. (D.E. 121-4, Pages 38-39). Defendants also make strenuous arguments that Plaintiff had immigration counsel as early as 2015 and her current counsel in early 2016 but she did not report any issue to authorities, even after she received her green card. To counter,

Rocky Treadway testified he did not complain to authorities because there was a chance Plaintiff would get deported.  (D.E. 121-4, Page 75).  In short, Plaintiff paints a picture of forced long hours with controlled, small freedoms as allowed by the Otero Defendants accompanied by threats of deportation while Defendants describe a loving family working together to create a successful business where everyone was content.  Having considered the evidence above and each summary judgment motion separately, the undersigned recommends there are genuine issues of material fact that exist and no party has established an entitlement to judgment as a matter of law as to the claims of peonage and forced labor.

"[M]any courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process" under Section 1589.  *Kiwanuka v. Bakilana*, 844 F.Supp.2d 107, 115 (D.D.C. 2012) (citations omitted).  "The threat of being forced to leave the United States can constitute serious harm to an immigrant within the meaning of the forced labor statute." *United States v. Rivera,* No. 09–CR–619 (SJF), 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012) (citations omitted).  It also "clearly falls within the concept and definition of 'abuse of legal process' when the alleged objective for such conduct was to intimidate and coerce Plaintiff into forced labor." *Antonatos v. Waraich,* No. 1:12–cv–1905–JMC, 2013 WL 4523792, at *5 (D.S.C. Aug. 27, 2013) (Threats of deportation to a physician equated to a claim of abuse or threatened abuse of the law or legal process)(quoting *Nunag–Tanedo v. E. Baton Rouge Parish Sch. Bd.,* 790 F.Supp.2d 1134, 1146 (C.D.Cal.2011)(holding that the threat of deportation constitutes "abuse of legal process" with the meaning of Section 1589 since

the objective is to intimidate or coerce the victim into forced labor). "The threat of deportation alone may support a claim for forced labor." *Aguirre v. Best Care Agency, Inc.,* 961 F.Supp.2d 427, 444, (E.D.N.Y. Aug. 16, 2013) (citing *United States v. Calimlim,* 538 F.3d 706, 713 (7th Cir. 2008)("[T]he immigration laws do not aim to help employers retain secret employees by threats of deportation, and so [defendants'] 'warnings' about the consequences were. . .an abuse of the legal process.")(other citations omitted). The United States Supreme Court has noted that "threatening ... an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude." *Kozminski,* 487 U.S. 931, 948 (1988).

Defendants assert there is no evidence they acted with the requisite intent and Plaintiff's alleged fear was not that of an objectively reasonable person as to constitute serious harm. However, the undersigned recommends there is a genuine question of material fact on these issues as Plaintiff has introduced evidence, as discussed above, from which a jury could infer the Oteros knowingly threatened immigration consequences in order to force Plaintiff to continue working for them in repayment of an alleged debt. *Calimlim*, 538 F.3d at 713 ("The evidence showed that the Calimlims intentionally manipulated the situation so that Martinez would feel compelled to remain.") Further, until she married Rocky Treadway, Plaintiff, who was in early twenties at the time she arrived in the United States, relied entirely on the Oteros for her shelter, food and clothes and had no significant financial resources, no formal education

and spoke little to no English.[12]   Therefore, there is a question of material fact as to whether an objectively reasonable person with the same background as Plaintiff and under her same circumstances would have felt compelled to continue working for the Defendants.   While Plaintiff does not allege any "threats of serious harm" other than deportation or "physical restraint" to [her]" and the record is replete with evidence that Plaintiff had the ability to come and go from the Oteros home, viewing the total circumstances, there is a sufficient dispute of material fact to permit a jury to determine whether Plaintiff understood she had any other option, especially as the Oteros were her relatives.[13]   As discussed above, Plaintiff has introduced evidence that Ms. Mao, also Plaintiff's relative, delayed living with her husband after their marriage because of her alleged obligation to work for the Oteros for three years and Rocky Treadway testified he and Plaintiff delayed their marriage by several years for the same reason.   Further, while

---

[12]The undersigned notes Plaintiff required the services of an interpreter at her recent depositions.

[13]Defendants rely heavily on the *Muchira* decisions.  *Muchira v. Al-Rawaf*, No. 1:14-cv-770, 2015 WL 1787144, at *6 (E.D. Va. Apr. 15, 2015)("[T]he critical inquiry for the purposes of the TVPA is whether a person provides those services free from a defendant's physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice.")(citation omitted); *Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017)(affirming district court decision).  There are similarities between the plaintiffs:  neither were physically abused or isolated and both maintained social media accounts and communicated with friends and family with their own cell phones. *Muchira*, 2015 WL 1787144 at *3-4.  However, this case is readily distinguishable from the case at hand as "there [was] no evidence that [the *Muchira*] plaintiff was, or thought she was, prohibited…from terminating her employment [or] that Defendants ever threatened her with any consequences if she terminated her employment…" *Muchira*, 2015 WL 1717144 at *6-7; *Muchira*, 850 F.3d at 619-20 ("[Defendants] never threatened her with arrest, deportation, adverse immigration consequences, or other legal consequences if she left their employment).  In fact, the defendants in *Muchira* retained the services of a law firm to successfully extend the plaintiff's visa and therefore, she was "at all times legally present" in the United States, "not an undocumented immigrant."  *Muchira*, 850 F.3d at 613 and 623.  Further, any demands or obligations for repayment for the cost of placing in her in the defendants' employment in the United States were made by her pastor in her home country, not by the defendants.  *Id*. Additionally, the *Muchira* Plaintiff fluently spoke and read English and had a history of working as a housemaid for private families before she began working for the defendants in Saudi Arabia when was 32-years old. *Muchira*, 850 F.3d at 605 and 620 ("Muchira was not an especially vulnerable victim.  She was not young, inexperienced, or brought to this country illegally.")  Additionally, the *Muchira* Plaintiff had an employment contract with the defendants, who she was not related to, with a set employment period and she never requested the contract terminated, attempting to end the parties' employment relationship for the first time after learning the Saudi family would be returning to Saudi Arabia and her employment in the United States would end.  *Id*.

Defendants continuously stress that Plaintiff never attempted to report her alleged forced labor, as Rocky Treadway testified, there was a chance Plaintiff could have been deported had she done so and, as Plaintiff testified and Defendants acknowledge, she wished to remain in the United States.  *Calimlim*, 538 F.3d at 713 (The victim was "throughout the relevant time in the United States illegally and was thus subject to deportation."); *United States v. Toure*, 965 F.3d 393, 402 (2020)(Withholding of victim's immigration documents and the failure to help the victim gain new ones was evidence of knowledge and intent to force the victim to work by prohibited means).  Therefore, the undersigned recommends there is a question of fact as to Plaintiff's claims of peonage and forced labor.

Further, as the undersigned recommends there is a question of fact as to Plaintiff's peonage and forced labor claims, the same is true of her claims under Section 1590 and Section 1593A which make liable "[w]hoever knowingly recruits, harbors, transports, provides or obtains by any means, any person for labor or services in violation of this chapter" or those who benefit financially from TVPA violations.  Accordingly, there is also a question of material fact as to Defendants' civil liability under Section 1595 for violating a provision of the TVPA.

## V.    RECOMMENDATION

The undersigned recognizes the serious problem of forced labor so many victims in this country and around the world have faced.  As Defendants stress in their briefing, there are violations of the TVPA much worse than those described here.  The undersigned also recognizes there are atypical employment situations, especially among

family members, that do not amount to violations of the TVPA. While the Defendants'
conduct, even from the Plaintiff's perspective, may not be as severe as other cases, that
does not mean Defendants' actions in this case also do not violate the TVPA. Given the
questions of material fact as described above, the undersigned recommends whether they
do is a question for a jury. Having considered the parties' Motions for Summary
Judgment and other related filings as discussed above, the undersigned
**RECOMMENDS** both Motions for Summary Judgment be **DENIED**. (D.E. 118 and
D.E. 121). The undersigned also **RECOMMENDS** Plaintiff's Motion to Strike be
**DENIED**. (D.E. 129).

Respectfully submitted this 4th day of September 2020.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).